IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN CORA, Individually and by and through EILEEN CORA, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. |
| HEALTH CARE SERVICE CORPORATION d/b/a BLUE CROSS BLUE SHIELD OF ILLINOIS, | ) ) ) ) ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff, JOHN CORA ("John"), individually, and by and through Eileen Cora ("Eileen"), states the following as his Complaint against Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois ("HCSC"):

**INTRODUCTION**

1.  This case is brought under the Employee Retirement Income Security Act of 1974 ("ERISA") to enforce John's rights under the health plan in which he is a participating beneficiary and to enjoin HCSC from reducing and then terminating coverage for 24/7 in-home skilled nursing care.

2.  John is quadriplegic and depends on a ventilator to breathe at various times during the day. John's disability results from a bicycle accident on August 2, 2015. After the accident, John spent six months in various hospitals and care centers, including the Rehabilitation Institute of Chicago (n/k/a Shirley Ryan Ability Lab), until February 2, 2016, when he was discharged to home. Since that day, he has required 24-hours-a-day skilled private duty nursing care in his home to manage a host of medical needs.

#93413940v7

3. Until April 1, 2020, John's healthcare insurer, HCSC, had paid for 24-hours-a-day skilled private duty nursing care as a covered service under the terms of John's health insurance plan. In a December 26, 2019 letter, however, HCSC announced that it would taper coverage of John's nursing care from 24-hours-a-day to nothing: by reducing coverage to 16 hours per day on April 1, 2020, by reducing coverage to 8 hours per day on July 1, 2020, and by fully terminating coverage on October 1 2020.

4. This is not HCSC's first effort to reduce John's level of care. In 2016, after initially approving 24/7 private duty nursing, HCSC attempted to end coverage but an independent reviewer reversed HCSC's decision. In 2017, HCSC attempted to reduce coverage from 24 hours per day to 16 hours per day, but HCSC reversed itself after John and Eileen challenged the decision and reinstated 24/7 benefits.

5. HCSC's latest decision to diminish, then end, coverage does not correspond to a diminishment, or end, of John's medical needs. John's condition has not improved since 2016, when HCSC first approved 24/7 nursing as medically necessary nor since July 2019, when HCSC last approved 24/7 skilled nursing as medically necessary. Nor has his need for skilled nursing care lessened. If anything, John's need for around-the-clock skilled nursing care has become more acute as he has aged and as the complexity of his care has increased.

### THE PARTIES, JURISDICTION AND VENUE

6. Plaintiff John Cora is nearly 79 years old and resides in Burr Ridge, Cook County, in the State of Illinois with his wife, Eileen. Eileen acts as his power of attorney. John immigrated to the United States from Italy at age 19. After serving in the U.S. Army, John worked for 27 years with the Internal Revenue Service. John retired from public service in 1999. At the time of his August 2015 accident, John worked at Cora Italian Specialties, Inc., a small business he started.

#93413940v7

John's son and wife, among others, continue to work at the family business; John also consults as he is able

7. Eileen Cora, John's wife, is nearly 74 years old. Before retiring in 2015 with 28 years of service, Eileen was a social worker with U.S. Department of Veteran Affairs.

8. Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois, which is headquartered in Chicago, Illinois, underwrites and administers health care plans, including the plan at issue in this action, which was issued to Cora Italian Specialties, Inc. According to financial reports on HCSC's website, the organization has assets of over $26 billion and unassigned surplus of over $16 billion.

9. This Court has jurisdiction over this action pursuant to ERISA §§ 502(e)(1) and (f) (29 U.S.C. §§ 1132(e)(1) and (f)), which allows the district court to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, which, in this case involves a group health plan (attached hereto as "Exhibit A") sponsored by Cora Italian Specialties, Inc. for the benefit of its employees and their dependents, which include Eileen and John Cora.

10. Jurisdiction in this Court is also proper pursuant to 28 U.S.C. § 1331, which provides subject matter jurisdiction over actions that arise under the laws of the United States.

11. Venue is proper in this District pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because the health care plan is administered in this District, the breach of the health care plan took place in this District, and Defendant HCSC resides in or may be found in this District.

## FACTUAL BACKGROUND

### Relevant Health Care Plan Provisions

12. John receives health care coverage in addition to his Medicare coverage under a benefit plan sponsored by Cora Italian Specialties, Inc. – Blue Advantage Entrepreneur Participating Provider Option – as beneficiary of Eileen Cora (Group/ID P98302/821927092). The benefit plan at issue is an "employee welfare benefit plan" under ERISA § 1003, 29 U.S.C. § 1002(1), (the "Plan"). At all relevant times, HCSC has served as the insurer and administrator of the Plan. John was and is a "beneficiary" of the Plan, as defined by 29 U.S.C. § 1002(8), by virtue of Eileen's employment and status as a "participant" in the Plan under 29 U.S.C. § 1002(7).

13. Under the Plan, HCSC has established a "Utilization Review Program" to perform a review of certain covered health care services prior to such services being rendered. Those covered services include private duty nursing services.

14. Coverage of private duty nursing is dependent on a finding by HCSC that the service is "medically necessary."

15. The Plan defines "medically necessary" as follows:

> MEDICALLY NECESSARY DETERMINATION
> The decision that Inpatient care or other health care services or supplies are not Medically Necessary will be determined by the Claim Administrator. The Claim Administrator will provide notification of a decision to not authorize payment for Inpatient care or other health care services or supplies to you, your Physician, and/or the Hospital or other Provider. The notification will specify the dates, services and/or supplies that are not considered Covered Services. For further details regarding Medically Necessary care and other exclusions from coverage, see the EXCLUSIONS – WHAT IS NOT COVERED section of this benefit booklet.
>
> ***
>
> EXCLUSIONS – WHAT IS NOT COVERED
>
> Expenses for the following are not covered under your benefit program.
>
> — Hospitalization, services and supplies which are not Medically Necessary.

4

#93413940v7

No benefits will be provided for services which are not, in the reasonable judgment of the Claim Administrator, Medically Necessary. Medically Necessary means that a specific medical, health care or Hospital service is required, in the reasonable medical judgment of the Claim Administrator, for the treatment or management of a medical symptom or condition and that the service or care provided is the most efficient and economical service which can safely be provided

\*\*\*

Examples of hospitalization and other health care services and supplies that are not Medically Necessary include:

**\*\*\***

The use of skilled or private duty nurses to assist in daily living activities, routine supportive care or to provide services for the convenience of the patient and/or his family members.

16. The Plan provides the following additional relevant definitions:

CUSTODIAL CARE SERVICE … means any service primarily for personal comfort or convenience that provides general maintenance, preventive, and/or protective care without any clinical likelihood of improvement of your condition. Custodial Care Services also means those services which do not require the technical skills, professional training and clinical assessment ability of medical and/or nursing personnel training and clinical assessment ability of medical and/or nursing personnel in order to be safely and effectively performed. These services can be safely provided by trained or capable non-professional personnel, are to assist with routine medical needs (e.g. simple care and dressings, administration of routine medications, etc.) and are to assist with activities of daily living (e.g. bathing, eating, dressing, etc.). Custodial Care Service also means providing care on a continuous Inpatient or Outpatient basis without any clinical improvement by you.

LONG TERM CARE SERVICES … means those social services, personal care services and/or Custodial Care Services needed by you when you have lost some capacity for self-care because of a chronic illness, injury or condition.

5

#93413940v7

> MAINTENANCE CARE … means those services administered to you to maintain a level of function at which no demonstrable and/or measurable improvement of condition will occur.
>
> PRIVATE DUTY NURSING SERVICE … means Skilled Nursing Service provided on a one-to-one basis by an actively practicing registered nurse (R.N.) or licensed practical nurse (L.P.N.). Private duty nursing is shift nursing or 8 hours or greater per day and does not include nursing care of less than 8 hours per day. Private Duty Nursing Service does not include Custodial Care Service.
>
> SKILLED NURSING SERVICE … means those services provided by a registered nurse (R.N.) or licensed practical nurse (L.P.N.) which require the clinical skill and professional training of an R.N. or L.P.N. and which cannot reasonably be taught to a person who does not have specialized skill and professional training. Benefits for Skilled Nursing Service will not be provided due to the lack of willing or available non-professional personnel. Skilled Nursing Service does not include Custodial Care Service.
>
> RESPITE CARE SERVICE … means those services provided at home or in a facility to temporarily relieve the family or other caregivers (non-professional personnel) that usually provide or are able to provide such services for you.

17. The Plan also provides, under "Other Covered Services," that "Private Duty Nursing Service" is a covered benefit, and further states:

> Private Duty Nursing Service-Benefits for Private Duty Nursing Service will be provided to you in your home only when the services are of such a nature that they cannot be provided by non-professional personnel and can only be provided by a licensed health care provider. No benefits will be provided when a nurse ordinarily resides in your home or is a member of your immediate family. Private Duty Nursing includes teaching and monitoring of complex care skills such as tracheotomy suctioning, medical equipment use and monitoring to home caregivers and is not intended to provide for long term supportive care. Benefits for Private Duty Nursing Service will not be provided due to the lack of willing or available non-professional personnel.

18. The Plan contains no quantitative limits on the benefits payable for Medically Necessary Private Duty Nursing Service.

#93413940v7

19. Care that is considered "Custodial" or "Long Term" or Maintenance" or "Respite" is not a covered benefit under the Plan.

### John's Health and Medical Needs

20. The 2015 bicycle accident has left John with complex medical needs: he requires intubation, mechanical ventilation, catheterization, frequent tracheal suctioning, cough assists, nebulization, and close monitoring of vital signs. Even with around-the-clock skilled care, John's condition remains fragile. Since being discharged to home in 2016, John has required eight to ten hospital admissions, including as recently as March 2020.

21. At the time of John's discharge from the Rehabilitation Institute of Chicago in 2016, due to his complex medical status and need for very skilled care, his doctors specified that John needed 24-hour-a-day private duty skilled nursing care. Those doctors further stated that it would be medically irresponsible and below the standard of medical care to allow an unskilled person to manage John's care. John has received 24-hour-a-day private duty skilled nursing care since 2016.

22. In a letter dated May 27, 2016, HCSC denied John's claim for reimbursement of private duty nursing services beginning September 2, 2016. John appealed that denial; and after his appeal was denied, he sought independent external review through the Illinois Department of Insurance pursuant to his rights under the Affordable Care Act. That review resulted in a determination that 24/7 private duty nursing services were medically necessary and overturned the benefit denial. A true and accurate copy of the 2016 independent review is attached hereto as Exhibit "B."

23. In 2017, HCSC attempted to reduce the number of hours of private duty nursing services that John received from 24 to 16 hours. In a recorded telephone conversation, John's

#93413940v7

pulmonologist, Dr. Lisa Wolfe, attempted to engage in a peer-to-peer review with a physician at HCSC to dispute HCSC's reduction in the private duty nursing hours. Over the phone, HCSC refused to engage in the peer-to-peer review with Dr. Wolfe yet included in HCSC's internal FILE documentation that the peer-to-peer review took place and that HCSC's decision was affirmed. After John complained to HCSC about its conduct, HCSC reversed its decision and reapproved 24/7 benefits. Until December 2019, HCSC has not attempted to curtail or terminate John's 24/7 nursing benefit.

24. Since the 2016 independent review, there has been no improvement in John's condition and his medical needs have remained the same. At periodic intervals, John has provided HCSC with letters of medical necessity and other documentation from his physicians and nursing care providers. For example, in 2018, John Bartizal, M.D., one of John's treating doctors, authored a letter of medical necessity, a copy of which is attached hereto as Exhibit "C." The same physician composed a "Plan of Care" on July 4, 2018 (copy attached as Exhibit "D") that itemized the skilled nursing services John required. There have been no alterations in either the medical necessity assessment nor the plan of care since 2018.

25. On July 31, 2019, HSCC issued a written determination that re-certified John's claim for 24/7 private duty nursing services (copy attached as Exhibit "E").

26. As recently as December 11, 2019, Jennifer Cotton, R.N., a nurse employed by HCSC documented the following with respect to John's medical needs:

> Skilled Nursing Services: SN [Skilled Nurse] caring for frequent trach[eotomy] suctioning, listening for secretions in upper airway, monitoring for increased work of breathing, SOB [shortness of breath], decreased O2 sat[uration], monitor for infections. Frequent cough assist via inexsufflator and neb[ulizer] txs [treatments]. SN to administer treatment for erratic BPs. VS [vital signs] must be monitored continuously day and night. Also SN to administer feeds/meds as he is G-tube [gastrotomy tube] dependent with electrolyte abnormalities. Pacemaker with chronic anemia; requires

> frequent lab work that a nurse is needed to interpret. Assist with ADLs [activities of daily living], skin integrity. Head to toe assessment each shift. NURSING NOTES: (pg 17-164 in folder 9344) Suction: Trach suctioning; listening for secretions in upper airway. Requires frequent, life-saving tracheal suctioning every 1-2 hrs, 24 hrs/day to maintain patent airway; nursing only to suction trach[eostomy]. Also suction nasally and orally. Vent Weaning: N/A. Only wears vent approx half of day/night. Vent settings: Trilogy 100 ventilator at night and during the day prn. SIMV mode: Rate 12; Tidal volume 500ml; PEEP +3; Insp time 1.4, Low pressure alarm 6, high pressure alarm 80. Seizure Activity: None noted.

See, Exhibit P, *infra.* (quoting the foregoing verbatim)

27. Despite the foregoing, in a December 26, 2019 letter, HCSC notified John and Eileen that reimbursement for 24/7 private duty nursing would be discontinued beginning April 1, 2020 as medically unnecessary. See Exhibit "F" attached hereto. From April 1, 2020 to July 1, 2020, only 16 hours a day would be approved; then only 8 hours a day from July 1, 2020 through September 30, 2020 would be approved; and then 0 hours beginning October 1, 2020, meaning no private duty nursing benefit whatsoever after October 1, 2020.

28. Following the notification that skilled nursing services were being reduced and eventually terminated, John appealed HCSC's determination through counsel pursuant to 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1. See Appeal Dated March 11, 2020 (copy attached as Exhibit "G") and Supplement to Appeal dated April 4, 2020 (copy attached as Exhibit "H") Throughout the appeal process, HCSC attempted to stymie and curtail John's right to a full and fair appeal. As detailed in the exhibits attached hereto, HCSC refused to engage in a peer-to-peer review with John's treating physician, appeared to ignore John's submissions, issued two different and inconsistent appeal decision that led only to confusion and wasted time, and imposed arbitrary and extremely difficult deadlines (e.g., requiring a submission on the Monday after Easter Sunday to a letter received on the Saturday before Easter). As a result, John had to file two complaints

9

#93413940v7

with the Illinois Department of Insurance, one of which remains pending. See, e.g., April 28, 2020 Complaint to Illinois Department of Insurance, copy attached as Exhibit "I."

29. That appeal to HCSC was unsuccessful, and John sought independent external review as he had done in 2016 (see attached letter from counsel Susan Loeb – copy attached as Exhibit "J"). John's counsel submitted hundreds of pages of documentation in the request for external review and summarized that John's medical condition and needs. The request also included John's doctor-approved plans of care and explained that they have remained unchanged for the four years that HCSC has covered the service. The external review also clearly demonstrated John's unstable medical condition, which necessitated an emergent hospitalization in March 2020 due to autonomic dysreflexia, septic shock, pneumonia, and a urinary tract infection.

30. Included as part of the John's external review submission was a letter and affidavit from Tamara Müller, the founder and chair of Independence Plus, a nursing staffing agency (copies attached as Exhibits "K" and "L"). The affidavit was originally drafted in 2016 and explained that under Illinois law, the services John requires are skilled and may not be provided by unskilled individuals. In the letter, Ms. Müller attests that her 2016 affidavit remains just as true in 2020 as it was in 2016.

31. Plaintiff also submitted a report from Alan Anschel, M.D., John's treating doctor from the Shirley Ryan AbilityLab, formerly known as the Rehabilitation Institute of Chicago. The letter, dated May 27, 2020 (copy attached as Exhibit "M"), explained the medical necessity of 24/7 private duty nursing care and included the following:

> I certify that the failure to have this coverage jeopardizes [John's] health and could result in premature death, brain damage, and rehospitalizations. Especially during this time of the Covid-19 pandemic, a step-down of treatment is dangerous for a 78 year old

> man who is quadriplegic, ventilator dependent, and at high risk of pneumonia, respiratory failure and other infections.
>
> Nearly four years after my 2016 letter, Mr. Cora's medical condition remains complex and unstable. He is dependent on a ventilator at night with a tracheotomy to breathe. It is standard of care treatment that ventilator and tracheotomy management be administered by skilled and licensed nurses and LPNs. It remains just as medically irresponsible, and below standard of care to allow any non-skilled person to manage at home this patient's medical needs, which include frequent tracheal suctioning, cough assists, nebulizer treatments, and close monitoring of vital signs. The use of non-licensed caregivers with intermittent skilled nursing visits is a medically dangerous substitute for 24-7 skilled nursing care….Round the clock skilled nursing care remains as medically necessary in 2020 as it has been since 2016.

32. Since Dr. Anschel referenced and incorporated his 2016 letter in his 2020 submission, a copy of his 2016 letter is attached hereto as Exhibit "N."

33. Also accompanying the request for independent review was a statement on behalf of Eileen Cora and John's two adult children, Gina and Mark (copy attached as Exhibit "O"). The letter pointed out that neither Eileen nor either of the Plaintiff's children can provide the necessary care. They could neither be trained to meet the necessary requirements, nor are they physical capable and/or available to provide care. The submission also recounted how John remains mentally astute and vibrant and that there are no viable alternatives to skilled private duty nursing, especially while the Covid-19 pandemic is raging.

34. Notwithstanding that Plaintiff submitted overwhelming evidence to support continuing 24/7 private duty nursing as medically necessary, and nothing in Plaintiff's medical status has changed from the last four years when those same benefits were approved by HSBC as medically necessary, the "independent" reviewer upheld HSHC's determination. A copy of that determination is attached as Exhibit "P." Almost the entirety of the written decision merely recounts (seemingly through extensive copying and pasting) John's medical history and the

11

records and reports compiled since 2016. The reviewer's actual decision to uphold HCSC's determination is merely conclusory and fails to offer a rationale or explain the basis for the opinion provided. Further, the determination appears to have been based in no small part on a misunderstanding that skilled services have been diminished without incident. The reality is that John continues to receive 24/7 skilled nursing services and is paying for it out of pocket at the cost of $52 per hour, although his financial resources are dwindling. As of today, John and Eileen are paying $832 per day to make up for the 16-hour gap in daily coverage.

**COUNT I-**
**CLAIM FOR BENEFITS, ENFORCEMENT OF RIGHTS**
**AND CLARIFICATIONS OF FUTURE BENEFITS RIGHTS**
**UNDER ERISA § 502(a)(1)(B) AGAINST HCSC AND THE PLAN**

35. Plaintiff reasserts and realleges the allegations of paragraphs 1 through 30 as if fully set forth herein.

36. Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), John and Eileen Cora are entitled to: (1) enforce their rights under the terms of the Plan, (2) clarify their rights to future benefits under the terms of the Plan, and (3) recover benefits due under the Plan that were wrongfully withheld.

37. As administrator of the Plan, HCSC makes all claims determinations and decides all benefit questions under the Plan. HCSC also funds the payment of benefits under the Plan, which, in this instance amounts to over $400,000 in benefit payments per year for skilled private duty nursing.

38. HCSC has an obligation pursuant to the terms of the Plan and in accordance with the obligations imposed on it by § 404 of ERISA (29 U.S.C. § 1104) to pay the benefits described in the Plan.

12

39. The Plan has a fiduciary obligation under ERISA, 29 U.S.C. § 1104, to ensure that its agents administer the plan "solely in the interest of the participants and beneficiaries" and in accordance with the plan terms; and to utilize "higher-than-marketplace quality standards" when rendering claim determinations according to *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 115 (2008).

40. HCSC's decision to diminish and eventually terminate private duty skilled nursing care for Plaintiff after approving benefits for 168 hours per week for more than 4 years and after having received an independent determination as to the medical necessity of such services was contrary to the medical evidence, contrary to Illinois legal requirements for skilled nursing, and places Plaintiff at risk of sudden death if his complex medical needs cannot be timely managed and addressed by skilled nursing personnel.

41. Since the inception of his claim for in-home skilled private duty nursing care in 2016, all of his care providers have repeatedly and unequivocally certified the medical necessity for 24/7 skilled private duty nursing care. Moreover, even HCSC acknowledged the medical necessity of such services and approved reimbursement for such services on multiple occasions. Nor has there been any change in John's medical condition that would justify a reduction in the services he receives.

42. Due to the ongoing necessity of private duty nursing care, a benefit covered by the Plan, Plaintiff is entitled under the terms of the Plan to be reimbursed for the expenses he has incurred since April 2020 and is also entitled to a finding that such services must continue until such time as John's skilled 24/7 private nursing care is no longer medically necessary for his care and treatment under the terms of the Plan.

#93413940v7

WHEREFORE, Plaintiff John Cora seeks entry of an order directing Defendant Health Care Services Corporation to reimburse them for all private duty nursing care paid for by Plaintiff since April 1, 2020 and for an order directing Health Care Service Corporation to maintain 24/7 skilling nursing care (168 hours per week) for Plaintiff until such time as 24/7 skilled nursing care is no longer necessary, and for such further relief as this Court deems just and proper, including an award of attorneys' fees pursuant to 29 U.S.C. § 1132(g), along with prejudgment interest on the expenditure reimbursement owed to Plaintiff.

Dated: July 6, 2020

By: */s/ Mark D. DeBofsky*
Mark D. DeBofsky
DeBofsky Sherman Casciari Reynolds, P.C.
150 N. Wacker Dr. Suite 1925
Chicago, IL 60606
(312) 561-4040 (phone)
(312) 929-0309 (fax)

#93413940v7